## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**ALEXANDER ZAJAC,**                          \*

    **Plaintiff,**                          \*

**v.**                                         \*          **Civ. No. DLB-22-1620**

**EMMETT JORDAN,**                             \*

    **Defendant.**                          \*

### MEMORANDUM OPINION

Self-represented plaintiff Alexander Zajac filed suit against Emmett Jordan, the Mayor of Greenbelt, Maryland, claiming violations of his constitutional rights and his rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.  ECF 1 & 4.  Zajac, who is visually impaired, alleges that Jordan made posts on social media that contained information that he could not read.  He further alleges that Jordan ridiculed him after he requested Jordan make the information available to people who use screen readers.  Jordan moves to dismiss the complaint. ECF 10.  That motion is fully briefed.  ECF 14 & 15.  Zajac requests permission to file a surreply, ECF 16, and to amend his complaint, ECF 17.  Jordan opposes both requests, ECF 18 & 19, and Zajac has filed a combined reply, ECF 20.

Rather than address the pending motions in chronological order, the Court will grant Zajac's motion to amend his complaint and treat Jordan's opposition to that motion as a renewed motion to dismiss.  This makes sense for three reasons.  First, Zajac's proposed amended complaint abandons several of his earlier claims and arguments, and the Court conserves judicial resources by not addressing those issues.  Second, Zajac's amended complaint includes additional factual allegations and so presents his remaining claims in a stronger form.  Finally, Jordan expressly incorporated his prior arguments into his opposition to the motion to amend, so he will not be

prejudiced by this approach.  *See* ECF 19, at 7 (incorporating by reference arguments in his motion to dismiss, reply, and opposition to filing a surreply).  Accordingly, Jordan's original motion to dismiss and Zajac's motion for permission to file a surreply are denied as moot.

For the following reasons, the renewed motion to dismiss is granted, and Zajac's amended complaint is dismissed with prejudice.

## I.    Background

The Court accepts all well-pleaded factual allegations in the amended complaint as true. Zajac resides in Prince George's County, Maryland.  ECF 17-1, ¶ 7.  He has poor eyesight and wears glasses.  *Id.* ¶ 8.  He also suffers from light sensitivity and floaters in his peripheral vision. *Id.*  ¶¶ 12–13.  Due to his visual impairments, he uses electronic devices with reduced screen brightness and dark mode enabled.  *Id.* ¶ 12.  To help read text on electronic devices, he uses the zoom function to increase the size of text.  *Id.* ¶ 11.  His visual impairments weaken his ability to see, walk, read, concentrate, think, and work.  *Id.* ¶ 14.

The tools Zajac uses to help him see text on electronic devices do not function with text that is displayed or embedded in images.  *Id.* ¶ 17.  Whereas normal text can adapt to different zoom levels and remain legible, images cannot and become blurry and pixelated when zoomed in. *Id.* ¶¶ 18–19.  As a result, it is far more difficult for Zajac to read text in images.  *Id.* ¶ 16.

Jordan was elected to the City Council of Greenbelt, Maryland, in November 2021 and subsequently became the city's mayor.  *Id.* ¶ 23.  He maintains several public social media pages: a public Facebook page called "Mayor Emmett Jordan," a public Facebook profile called "Emmett Jordan," and a Twitter account with the handle @EmmettJordan4MD.  *Id.* ¶¶ 26–27.  His Facebook page and profile are part of a private Facebook group called "Greenbelters."  *Id.* ¶ 26.  Jordan uses his social media accounts to post about deals and services provided by local businesses.  *Id.* ¶ 50.

The City of Greenbelt has adopted the Web Content Accessibility Guidelines ("WCAG") 2.0 from the World Wide Web Consortium to provide Level AA accessibility to web users who visit the city's webpage.  *Id.* ¶ 54 (citing *Accessibility*, https://www.greenbeltmd.gov/government/ city-administration/public-information-communications/accessibility).  The guidelines include a principle that "[a]ll non-text content that is presented to the user has a text alternative that serves the equivalent purpose."  *Id.* (citing *Web Content Accessibility Guidelines (WCAG) 2.0*, https://www.w3.org/TR/WCAG20/).

On February 12, 2022, Jordan posted to his page and to the Greenbelters group, "Free health screenings at Beltway Plaza Mall and Greenbelt Aquatic and Fitness Center Saturday (02/12) from 10-3pm in honor of Black History Month.  All are welcome!!!"  *Id.* ¶¶ 28, 30.  On Twitter, he posted, "Free Health screenings @BeltwayPlaza and Greenbelt Aquatic & Fitness Center - Saturday (02/12) from 10-3pm in honor of Black History Month."  *Id.* ¶ 32.  He also created a Facebook event for the screenings.  *Id.* ¶ 31.  Each posting included an image with information about "where in the parking lot" the health screenings would be provided and "which screenings would be provided."  *Id.* ¶¶ 29–33.  Specifically, the images stated that mobile health vehicles would be in the front parking lot of the mall and the parking lot of the fitness center and would provide blood pressure, BMI, and glucose screenings, among others.  ECF 4, at 13 (screenshot of Facebook post).  The images also included a smaller picture of a large, bus-style vehicle in a parking lot.  *Id.*  The additional text information within the images was not provided in text outside of the images.  ECF 17-1, ¶¶ 29–33.

Zajac was unable to read the information contained in the images, including "which medical tests were being offered at each community health screening" and "the location of the community health screening at Beltway Plaza Mall," a 900,000 square foot facility.  *Id.* ¶¶ 43–44.

He commented on the post in the Greenbelters group and asked Jordan to "make the details in that image available to folks with screen readers." *Id.* ¶ 34.  In his comments, he stated that he thought Jordan's Facebook page was "technically [his] campaign's page." *Id.* ¶ 36.  Jordan replied that his page is "a 'government official' page" that he uses "to share city-related information" and "not a 'campaign page'" or "personal page[.]" *Id.* ¶ 37; ECF 4, at 15 (screenshot of Facebook comment). Several minutes later, Jordan switched to his profile and replied, "I'm sorry that you are bitter about the results of the last City Council election.  I hope you can find some more constructive ways to become engaged in the affairs of the City." ECF 17-1, ¶ 61.  Another Facebook user liked Jordan's reply. *Id.* ¶ 62.

On June 10, 2022, Jordan posted to his page, "Please join in this important dialogue Sunday, June 12 from 7-9pm on Race Amity Day in Greenbelt." *Id.* ¶ 56.  This post, too, included an image with information that was not available in text outside of the image. *Id.* ¶ 57. Specifically, the image included information "about joining the Zoom and about the event itself" that Zajac was unable to read. *Id.*  The image included Zoom meeting access information, a QR code, and a picture of Rabbi Abraham Heschel and Dr. Martin Luther King Jr.  ECF 17-3 (screenshot of Facebook post).

Because Zajac could not read the precise location of the free February 12 health screenings or which medical tests were being offered, he felt unable to take advantage of screenings.  ECF 17-1, ¶¶ 43–44.  Likewise, because he could not read the information contained in the Race Amity Day image, he felt unable to join the Zoom event. *Id.* ¶ 57.  Zajac did not request that the information in the Race Amity Day image be made available in plain text because he "did not want to be belittled and insulted on a public forum" as had happened before. *Id.* ¶ 66.

Zajac seeks a declaratory judgment that Jordan violated Titles II, III, and IV of the ADA; injunctive relief prohibiting future violations of the ADA; damages under 42 U.S.C. § 1983; and an award of attorneys' fees and costs. *Id.* at 14.

## II.   Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)).  To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court.  *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A plausible claim is more than merely conceivable or speculative.  *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022).  The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully."  *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678)).  But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory.  *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader.  *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022).  But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments."  *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)).  Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard."  *Sheppard v. Visitors of Va. State*

*Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)).  The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses."  *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

Usually, "pro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'"  *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).  Such lenient treatment is not warranted when a self-represented plaintiff is a lawyer or has substantial legal training.  *See Rashad v. Jenkins*, No. 3:15cv655, 2016 WL 901279, at *3 (E.D. Va. Mar. 3, 2016) (collecting cases).  The Court takes judicial notice of the fact that Zajac is a licensed attorney admitted to the Maryland bar, and it will not afford his pleadings special consideration as it would for a self-represented plaintiff who is not a lawyer.[1]

## III.    Discussion

Zajac brings four claims in his amended complaint, which the Court renumbers as follows: (1) violation of Title II of the ADA, 42 U.S.C. § 12132, by denying him access to certain information available to non-disabled individuals and refusing to provide a reasonable accommodation; (2) violation of Title III of the ADA, 42 U.S.C. § 12182, for the same conduct; (3) violation of Title IV of the ADA, 42 U.S.C. § 12203, for retaliating against him for insisting on his right to access the information; and (4) deprivation of equal protection in violation of 42 U.S.C. § 1983 based on the discriminatory enforcement of Greenbelt's guidelines regarding web accessibility.  The Court addresses each claim in turn.

---

[1] Even if the Court construed Zajac's pleadings as liberally as it would for an unrepresented, non-lawyer plaintiff, his claims still would fail for the reasons identified below.

**A.  ADA Title II – Discrimination by Public Entity**

Title II of the ADA prohibits discrimination by a public entity against an individual because of his or her disability.  *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018).  The law provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The term "public entity" means "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority . . . ."  *Id.* § 12131(1).  Zajac claims that Jordan, in his official capacity as the mayor of Greenbelt, discriminated against him by denying him access to the information contained in the images Jordan posted on social media and by refusing to accommodate his request that the image text be made more accessible.

To prove disability discrimination by a public entity under Title II, a plaintiff must establish that (1) he has a disability, (2) he is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) he was denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability.  *Wicomico*, 910 F.3d at 750 (citing *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016)).  The causation requirement is satisfied when "the disability was a motivating cause of the exclusion."  *Id.* (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012)).  Zajac need not prove his *prima facie* case at the pleading stage, but he must "allege facts sufficient to state all the elements of [his] claim."  *Id.* at 751 (quoting *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)).

The Court assumes without deciding that Zajac has alleged that he has a disability due to his visual impairments and that he is otherwise qualified to receive the benefits of Jordan's social media posts.[2]  Even so, his Title II claim fails because he does not sufficiently allege that he was denied the benefits of the posts or otherwise discriminated against because of his disability.  The Fourth Circuit has recognized three distinct grounds for relief under Title II: (1) intentional discrimination or disparate treatment, (2) disparate impact, and (3) failure to make reasonable accommodations.  *Lamone*, 813 F.3d at 503 n.5 (citing *A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008)).  Zajac's allegations do not plausibly support any of the three grounds.

"While the Fourth Circuit has not specifically addressed the standard required for proving intentional discrimination [in the Title II context], the majority of circuits to have decided the issue have adopted a deliberate indifference standard, as have some district courts within the Fourth Circuit."  *Bone v. Univ. of N.C. Health Care Sys.*, No. 1:18cv994, 2021 WL 395547, at *2 (M.D.N.C. Feb. 4, 2021) (collecting cases).  "In order to prove deliberate indifference, 'a plaintiff must show that the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood.'"  *Id.* (quoting *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831 (11th Cir. 2017)).  Zajac argues that Jordan's response to his request to make the details in images available for screen readers was insulting and displayed "purposeful and spiteful" disregard for the law's requirements.  ECF 20, at 6.  But Jordan stated only that he was sorry that Zajac was bitter about the previous election and hoped that Zajac could find constructive ways to participate in city affairs.  He did not remark upon, much less disparage, Zajac's visual impairment

---

[2] Jordan disputes that his alleged conduct was the provision of a public service but reserved argument on the issue.

or the visually impaired.  Nor did he mention the ADA or its requirements.  Nothing about his comment supports a reasonable inference that Jordan acted with animus towards the visually impaired or posted the images with deliberate indifference to their rights.  To the contrary, the allegations indicate that Jordan posted the locations, time windows, and nature of the events in plain text alongside the images, making that information accessible to the visually impaired.  And while Jordan did not comply with Zajac's request to "make the details in [the] image available to folks with screen readers" or explain why he declined to do so, as the Court will explain, his alleged conduct was not a clear violation of the ADA's requirements.  Zajac has not sufficiently alleged that Jordan knew that "harm to a federally protected right was substantially likely[.]"  *See Silva*, 856 F.3d at 831.

As for disparate impact, Zajac does not allege that he was denied an equal opportunity to participate in and take advantage of the events at issue.  For sure, he alleges that he did not participate in the health screenings or Race Amity Day dialogue because he lacked the information available only in the images.  But Jordan provided in a readable format for the visually impaired all the information necessary to participate.  The plain text of the posts for the health screenings included where and when the third-party event would occur and what kind of services would be offered.  Likewise, the plain text for the Race Amity Day post included information about the nature of the event and its time and duration.  Zajac argues that he did not know which health screenings were available, where specifically the health screenings were located at the mall and the fitness center, how to join the Zoom meeting, or what the precise topic of the Race Amity Day dialogue would be.  He cites no authority suggesting that such a granular level of information is necessary to comply with Title II, and the Court is aware of none.  Department of Justice regulations addressing disability discrimination under Title II state that public entities "shall take

appropriate steps to ensure that communications with . . . members of the public . . . with disabilities are as effective as communications with others[,]" 28 C.F.R. § 35.160, and "shall ensure that interested persons, including persons with impaired vision or hearing, can obtain information as to the existence and location of accessible services, activities, and facilities[,]" 28 C.F.R. § 35.163.  Another regulation, 28 C.F.R. § 35.130(b)(1), enumerates various ways a public entity might discriminate against the disabled, including by denying "equal opportunity" to participate in an aid, benefit, or service.  These regulations "are the agency's interpretation of the statute, and they are therefore given 'controlling weight' unless they conflict with other departmental regulations or the ADA itself."  *Lamone*, 813 F.3d at 506 (quoting *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 338 (4th Cir. 2012)).  Zajac has not alleged that Jordan's conduct violated these regulations.  The only plausible reading of his allegations, even when viewed in the light most favorable to him, is that Jordan provided enough information for Zajac to know the existence and location of the health screenings and the Race Amity Day dialogue and afforded him an equal opportunity to participate in those services and activities.

Moreover, even though Zajac could not read the text in the images, the images included non-text information that answered some of his questions.  The health screening images included smaller photos of a mobile health vehicle in a parking lot, indicating where at the facilities the screening could be found (the parking lots).  The Race Amity Day image included a photo of the two individuals that would be the topic of the dialogue, as well as a QR code to join the Zoom meeting, which Zajac does not allege he could not have accessed.  Zajac may not have had all the same information as a non-visually impaired member of the public, but he had equal access and opportunity to take advantage of the events Jordan shared.  He does not allege disparate impact.

Finally, regarding the failure to provide a reasonable accommodation, the Court concludes for the same reasons that no additional accommodation was required.   The implementing regulations of Title II provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  *Adams v. Montgomery Coll. (Rockville)*, 834 F. Supp. 2d 386, 393 (D. Md. 2011) (quoting 28 C.F.R. § 35.130(b)(7)). Because Zajac's allegations show that he had an equal opportunity to participate in the health screenings and the Zoom meeting based on the information available to him in plain text and in the images, no modification to the communications was necessary to avoid discrimination on the basis of his disability.

The Title II claim is dismissed.

### B.  ADA Title III – Discrimination in Public Accommodation

Title III of the ADA prohibits discrimination against individuals on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182.  Zajac argues in the alternative to his Title II claim that Jordan's social media pages are public accommodations within the meaning of Title III and that Jordan discriminated against him under that title.

"To prevail under Title III of the ADA, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against him because of his disability."  *J.D. ex rel. Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669–70 (4th Cir. 2019).  The

Court's conclusion that Zajac does not allege Jordan discriminated against him because of his disability applies equally to this claim.

The Title III claim also fails because Jordan's social media pages are not places of public accommodation covered by Title III.  The ADA defines "public accommodation" to include certain enumerated "private entities . . . if the operations of such entities affect commerce[.]"  42 U.S.C. § 12181(7).  For example, hotels, restaurants, movie theaters, grocery stores, libraries, schools, zoos, and spas are places of public accommodation.  *Id.*  The term also encompasses broader categories consistent with the purposes of the enumerated facilities—for example, in addition to auditoriums, the law also reaches "any other place of public gathering[.]"  *Id.* § 12181(7)(D).  A "private entity" is "any entity other than a public entity[,]" a term the Court already has defined. *Id.* § 12181(6).

Jordan argues that common sense indicates that his social media pages are not covered by Title III.  The Fourth Circuit has not addressed whether or when Title III might apply to webpages or other non-physical places, but the Court is persuaded that the law does not apply here.[3]  This is so for three reasons.  First, Jordan is a public official, whereas Title III applies to private entities. Second, Jordan's social media pages are not physical places and have only limited and tenuous connections to such places.  Third, Zajac does not allege that Jordan's social media pages are connected to any commercial activity or offer commercial services to the public.  Zajac's allegations cannot be reconciled with the text of Title III.

---

[3] In an unpublished opinion nearly two decades ago, the Fourth Circuit affirmed a district court's conclusion that "chat rooms and other online services do not constitute a place of public accommodation" under Title II of the Civil Rights Act of 1964.  *Noah v. AOL Time Warner Inc.*, 261 F. Supp. 2d 532, 540 (E.D. Va. 2003), *aff'd*, No. 03-1770, 2004 WL 602711 (4th Cir. Mar. 24, 2004) (unpublished).

Zajac counters that the First and Ninth Circuits have held that Title III can apply to websites and online entities. *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019) (holding Title III applies to websites with sufficient nexus to physical places of public accommodation such that web inaccessibility impedes access to the physical services); *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Assoc. of New England, Inc.*, 37 F.3d 12, 18–20 (1st Cir. 1994) (holding Title III is not limited to "actual physical structures"); *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 200 (D. Mass. 2012) (applying Title III to website for a "business[] that s[old] services through the Internet"). That may be so, but even in those circuits, the Court has found no precedent for applying Title III to the social media pages of an individual, let alone a public official, when the online posting did not involve commercial activity. The Court need not decide the persuasiveness of the out-of-circuit precedent on this issue since Zajac's Title III claim would be a significant stretch even in those courts.

Zajac suggests Jordan's use of the title "Mayor" on the social media pages and his sharing of city-related information "ties the Facebook page to Defendant's work at the Greenbelt Municipal Building[,]" which Zajac asserts "is both a 'social service center establishment' and a 'place of public gathering'" as defined in Title III. ECF 17-1, ¶ 49. Such activity might create a sufficient nexus with a physical place under out-of-circuit precedent if the physical place was a private entity offering public accommodations. *See Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 389 (E.D.N.Y. 2017) (collecting cases and explaining the nexus test asks whether "the website's inaccessibility interferes with the 'full and equal enjoyment' of the goods and services offered at the physical store"). But it is not. The Greenbelt Municipal Building is where the city's offices are located. It is nothing like a pizza place, for example. *See Robles*, 913 F.3d at 904–05. Nor does it matter that Jordan "engages in numerous posts about deals and services

provided by local businesses that are places of 'public accommodation[.]'" ECF 17-1, ¶ 50. This conduct, Zajac suggests, ties Jordan's Facebook page to these places, but Zajac cites no precedent that such a tenuous link might give rise to liability when Jordan has no alleged connection or financial interest in the commercial entities. Indeed, that interpretation conflicts with the text of the statute, which refers only to places of public accommodation and those who own, lease, or operate them. *See* 42 U.S.C. § 12182(a).

The Title III claim is dismissed.

### C. ADA Title IV – Retaliation

Title IV of the ADA provides that "no person shall discriminate against any individual" for engaging in protected opposition or participation activity. 42 U.S.C. § 12203(a). Zajac claims Jordan retaliated against him by insulting and ridiculing him for requesting that the image text be made accessible to people who use screen readers.

Zajac sues Jordan for retaliation in both his official capacity and his individual capacity. The individual capacity claim is foreclosed by Fourth Circuit precedent. "Because Title VII does not authorize a remedy against individuals for violation of its provisions, and because Congress has made the remedies available in Title VII applicable to ADA actions, the ADA does not permit an action against individual defendants for retaliation for conduct protected by the ADA." *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999). Zajac does not dispute that *Baird*'s ruling bars his individual-capacity retaliation claim. He argues that *Baird* "has been roundly criticized for its analysis" and urges the Court to "reconsider[]" it. ECF 14, at 14 (citing *Shotz v. City of Plantation*, 344 F.3d 1161, 1174 n.20 (11th Cir. 2003) (describing *Baird*'s holding as "inexplicabl[e]")). His arguments are better addressed to the Fourth Circuit. The Court must follow *Baird*.

On the merits, the official-capacity retaliation claim fares little better.  To state a *prima facie* retaliation claim, a plaintiff must allege (1) that he engaged in a protected activity, (2) that the defendant took an adverse action against him, and (3) that the two events were causally linked. *A Society Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011).  Protected activity includes protesting or complaining about conduct that the complainant reasonably and in good faith believes is a violation of the ADA.  *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002).  Retaliatory actions "must be 'materially adverse,' meaning that the plaintiff must show that the action 'well might have dissuaded a reasonable [person] from'" engaging in protected activity.  *Laird v. Fairfax Cnty.*, 978 F.3d 887, 893 (4th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 62 (2006)).  The "harm must be a *significant detriment*, not relatively insubstantial or trivial."  *Id.* (quoting *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015)) (internal quotation marks omitted).

The Court assumes that Zajac has alleged protected activity based on his request that the image text be made more accessible.  But he does not allege that he suffered any materially adverse action as a result.  The alleged retaliatory conduct is Jordan's comment responding to his request: "I'm sorry that you are bitter about the results of the last City Council election.  I hope you can find some more constructive ways to become engaged in the affairs of the City."  ECF 17-1, ¶ 61. Zajac describes Jordan's comment as insulting, intimidating, and threatening.  He asserts that it obviously was intended to "belittle [him] in front of other Greenbelt residents" and reduce his "standing in the community[,]" and he notes that it is "posted permanently (viewable to this day)" and received one "like" from another Facebook user.  ECF 17-1, at 10; ECF 20, at 8.  Zajac may feel insulted, threatened, and ridiculed by Jordan's comment, and he may well have refrained from further accessibility requests to avoid another round of what he saw as a public shaming.  But no

reasonable person would be dissuaded by Jordan's comment.  It is the kind of insubstantial and trivial consequence that courts have held falls outside the scope of the ADA's retaliation provision. *See, e.g.*, *Adams*, 789 F.3d at 431 (collecting cases).  Jordan's alleged conduct was not materially adverse and cannot support a retaliation claim.[4]

The cases Zajac cites do not alter this conclusion.  In *Higdon v. Jackson*, the Eleventh Circuit addressed two potentially adverse actions by different defendants.  393 F.3d 1211, 1219–20 (11th Cir. 2004).  Zajac highlights one of the defendants, McMichael, who allegedly hit the plaintiff's truck with his car and stared silently at the plaintiff after she approached his car window. *Id.* at 1217.  The court assumed without deciding that McMichael's conduct constituted an adverse action because it involved "an alleged battery," even though there was no damage to the plaintiff's vehicle. *Id.* at 1220.  Jordan's conduct is not similar to McMichael's.  Whereas a reasonable person would be intimidated and threatened by a person who physically strikes his or her car with another vehicle and silently stares when approached, no reasonable person would be intimated by a Facebook comment that does not suggest violence or hostility.  Rather, Jordan's conduct is closer to that of the other defendant in *Higdon*, Eberhardt.  The court dismissed the retaliation claim against Eberhardt because the plaintiff alleged only that he approached her on several occasions and criticized her in front of customers. *Id.* at 1219.  That conduct may have been "rude," but the court reaffirmed that "the civil rights laws were not intended to be a 'civility code.'" *Id.* at 1220.

Separately, Zajac points to two cases that found adverse actions when schools allegedly had excluded students from activities, denied or rescinded their educational accommodations, and

---

[4] Zajac dismisses the suggestion that the comment was not sufficiently adverse as a "factual dispute as to *how* adverse Defendant's actions were."  ECF 14, at 15.  In finding that Zajac has not alleged a materially adverse action, the Court does not resolve a factual dispute.  It accepts Zajac's allegations as true, draws all reasonable inferences in his favor, and still finds he has not alleged that Jordan took a materially adverse action in response to his protected activity.

refused to evaluate and place the students according to their abilities, among other alleged conduct. *See Weixel v. Bd. of Educ.*, 287 F.3d 138, 149 (2d Cir. 2002); *Alston v. Dist. of Columbia*, 561 F. Supp. 2d 29, 43 (D.D.C. 2008).  He asserts that the refusal to accommodate him and provide information to him "according to his abilities" is a similarly adverse action.  ECF 14, at 16.  These cases involved the repeated denial of educational services to school children with learning differences, and they are readily distinguishable.  In *Weixel*, the plaintiffs alleged that they repeatedly sought reasonable accommodations for their daughter's disability, which interfered with her ability to attend school, and the defendants responded by threatening and instituting child welfare and child abuse investigations, holding the student back, and refusing to academically evaluate her and place her according to her abilities.  287 F.3d at 142–45, 149.  In *Alston*, the plaintiff alleged that the student's IEP team determined that she should receive day instruction at a special program and the defendants responded by reclassifying the student's disability, trying to move her to a public school, refusing to pay for the day program for several years, and missing deadlines that resulted in the student missing a year of school entirely.  561 F. Supp. 2d at 34–35.  Over the several years at issue, the plaintiff had engaged in protected activity by advocating for the student and what she regarded as reasonable accommodations in IEP meetings, administrative hearings, and civil lawsuits.  *Id.* at 44.  The students in *Alston* and *Weixel* allegedly were denied reasonable accommodations and educational opportunities in retaliation for seeking reasonable accommodations.  Zajac, conversely, has not sufficiently alleged he needed an accommodation.  His "abilities" may be limited by virtue of his vision impairment, but Jordan provided him with enough accessible information to determine the existence and location of the services despite his limited abilities.  *Weixel* and *Alston* do not support Zajac's position.

The retaliation claims are dismissed.

### D.  Section 1983 – Equal Protection

Finally, Zajac asserts a § 1983 claim based on an equal protection violation.  "To recover damages under 42 U.S.C. § 1983, a plaintiff must show (1) 'the conduct complained of was committed by a person acting under color of state law,' and (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States."  *Martin v. Duffy*, 977 F.3d 294, 298–99 (4th Cir. 2020) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).  Zajac charges that Jordan deprived him of his rights under the Equal Protection Clause of the Fourteenth Amendment by discriminatorily enforcing Greenbelt's guidelines regarding web accessibility.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  It is concerned with disparate treatment "through the enactment, administration, or enforcement" of laws and regulations.  *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995).  It "is essentially a direction that all persons similarly situated should be treated alike" by the government.  *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  However, the Equal Protection Clause "prohibits only intentional discrimination; it does not have a disparate-impact component."  *Ricci v. DeStefano*, 557 U.S. 557, 627 (2009) (Ginsburg, J., dissenting) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).  "To succeed on an equal protection claim, a plaintiff must . . . demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of

scrutiny." *Id.*  Courts apply different levels of scrutiny depending on the type of classification the law makes.  *See id.* at 654–55.

Zajac alleges that Jordan treated him differently than people who are not visually impaired because he did not comply with the web accessibility guidelines Greenbelt has adopted, which require all non-text content to have a text alternative that serves the equivalent purpose.  He alleges that those guidelines should be construed as a regulation with the force of law that binds Jordan's actions on his Facebook page.  For this proposition, he cites *Pathways Psychosocial v. Town of Leonardtown I (Pathways I)*, which concerned a zoning regulation that the plaintiff organization alleged had "been administered or enforced discriminatorily" against it based on its clients with mental disabilities.  133 F. Supp. 2d 772, 791 (D. Md. 2001).  In *Pathways I*, this Court held that the plaintiff's equal protection claim survived summary judgment because there was evidence that the defendant had imposed additional regulatory burdens on the plaintiff because of animus towards the plaintiff's disabled clientele.  *Id.* at 792.  While the discriminatory enforcement of a regulation may give rise to an equal protection violation, the facts in *Pathways I* are a far cry from Zajac's allegations.  Based on the links included in Zajac's amended complaint, the accessibility guidelines are normative, and Greenbelt has expressed an intent to implement them on the city's website.  Even if the guidelines could be construed as a regulation with the force of law, and even if they could be read to extend beyond the city's website and apply to Jordan's social media pages, the "regulation" would consist of best practices to be followed by municipal actors.  There is no conceivable way it could be enforced or administered against private citizens like Zajac, equally or unequally.  As a result, Zajac does not allege unequal treatment by the government through the enactment, administration, or enforcement of any law or regulation.

Even if Zajac had alleged unequal treatment, he does not plausibly allege any discriminatory intent or purpose.  "Discriminatory purpose" requires more than awareness of consequences; it requires that the decisionmaker "selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)).  Zajac suggests the requisite discriminatory animus can be inferred from Jordan's reply after Zajac requested that the text in the images be made accessible to people who use screen readers.  In some cases, "[d]erogatory remarks can be direct evidence of intent to discriminate." *Pathways Psychosocial v. Leonardtown (Pathways II)*, 223 F. Supp. 2d 699, 710 (D. Md. 2002) (citing *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003)).  But as the Court has explained, Jordan's retort does not give rise to an inference of discriminatory animus, even if, as Zajac alleges, the response was "over the top" and "rude and unbecoming rhetoric." ECF 20, at 12.

The § 1983 claim is dismissed.

**E.  Dismissal With Prejudice**

Zajac had the opportunity to amend his pleading in response to the deficiencies identified by Jordan and filed an amended complaint that still failed to state viable claims.  The deficiencies in Zajac's claims are not the kind that can be cured through further amendment.  Dismissal with prejudice is warranted.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (stating courts need not provide opportunity to amend if amendment would be futile); *United States ex rel. Carson v. Manor Care, Inc.*, 851 F.3d 293, 305 n.6 (4th Cir. 2017) ("[W]hen a complaint is incurable through amendment, dismissal is properly rendered with prejudice and without leave to amend.").

## IV.     Conclusion

Zajac has failed to state a plausible claim for relief.  The renewed motion to dismiss is granted, and Zajac's amended complaint is dismissed with prejudice.  A separate order follows.

Date:  March 31, 2023

Deborah L. Boardman
United States District Judge